## Mine Inspection for Explosive Gas

MARGIOTTI, Attorney General, April 20, 1938.—You have asked to be advised as to the proper interpretation of that portion of article V, sec. 1, of the Bituminous Mine Law of June 9, 1911, P. L. 756, as last amended by the Act of July 1, 1937, P. L. 2486, 52 PS §921, which provides as follows:

"In such portions of a mine, wherein explosive gas has been generated within one year before the passage of this act, or shall be generated after the passage of this act, in sufficient quantities to be detected by an approved safety lamp, the mine foreman shall employ a fire boss or fire bosses, whose competency to act as such shall be evidenced by a certificate of qualification from the Department of Mines on the recommendation of the examining board, as provided for in section six, article twenty-four of this act. It shall be the duty of the fire boss to

examine carefully, *before each shift enters the mine*, every working place, without exception, all places adjacent to live workings, every roadway, and every unfenced road to abandoned workings and falls in the mine; but before proceeding with the examination, he shall see that the air current is traveling in its proper course. In making the examination he shall use no light other than that enclosed in an approved safety lamp. The examination shall begin within three hours prior to the appointed time for each shift to enter the mine." (Italics supplied.)

You state that your inquiry is prompted by the fact that a majority of mine operators feels that the aforesaid examination need only be made when the mine is in actual operation. You also state that the interpretation of this provision which has been adopted by these operators arises out of the fact that the word "shift" is used therein.

It is true that the technical definition of the word "shift" is "A set of workmen who work in turn with other sets": 57 C. J. 1143; or "a set of workmen . . . that relieves another set": New Century Dictionary.

We do not feel, however, that the word "shift" as used in the above-quoted provision should be given such a narrow and technical interpretation. The title of the Act of 1911, supra, provides:

"An Act to provide for the health and safety of persons employed in and about the bituminous coal-mines of Pennsylvania, and for the protection and preservation of property connected therewith."

A statute enacted for such laudable purposes as this should be liberally construed so as best to effectuate its aims. As is stated in section 51 of the Statutory Construction Act of May 28, 1937, P. L. 1019:

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature. Every law shall be construed, if possible, to give effect to all its provisions.

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—(1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

It requires but a moment's thought to arrive at the conclusion that it would defeat one of the most important objectives in the statute if the above-quoted provision were so construed as to require inspection only while the mine is in actual operation and while groups of men are replacing each other at stated intervals within the technical interpretation of the word "shift".

It is after a mine has been idle for a period of time that accumulations of gas are more likely to be present, and it is just before a group of men plans to enter a mine after a period of idleness that an inspection is most essential for their safety. As evidence of this it is only necessary to refer to the recent explosions in the Kramer Mine and in the Harwick Mine, each of which cost the lives of a number of miners, solely because the mines had not been examined for explosive gases before the men entered after a period of inactivity.

It is not plausible that the legislature, by using the word "shift", intended to permit that the precaution of examination should be relaxed at the very time when it is most essential.

Further support is given to our opinion that the above-quoted provision was not intended to apply only while

the mine was in actual operation by article V, sec. 2, of the Act of 1911, which provides in part as follows:

"A suitable record book shall be kept at the mine office, on the surface, of every mine wherein fire bosses are employed, and immediately after the examination of such mine or any portion thereof by a fire boss, whose duty it is to make such examination, he shall enter in said book, with ink, a record of such examination, and sign same. This record shall show the time taken in making the examination, and also clearly state the nature and location of any danger that may have been discovered in any room or entry or other place in the mine, and, if any danger or dangers have been discovered, the fire bosses shall immediately report the location thereof to the mine foreman. No person shall enter the mine until the fire bosses return to the mine office on the surface, or to a station located in the intake entry of the mine (where a record book as provided for in this section shall be kept and signed by the person making the examination), and report to the mine foreman or the assistant mine foreman, by telephone or otherwise, that the mine is in safe condition for the men to enter."

We feel, therefore, that it would violate every precept of caution and safety, as well as the spirit and intent of the Act of 1911, as amended, to interpret the above-quoted portion of article V, section 1, so as to limit its applicability solely to those periods during which the mine is in regular operation under a system of shifts, as that term is used in its technical sense.

You are accordingly advised that section 1 of article V of the Act of 1911, as last amended by the Act of 1937, supra, requires that the examination referred to therein shall be made before any group of workmen enters a mine, whether or not the mine is in regular operation under a system of alternate shifts.